UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DARNELL MCMILLER, aka "Murder" | No. 13 CR 861<br><br>Judge Rebecca R. Pallmeyer |

## GOVERNMENT'S POSITION PAPER AS TO SENTENCING FACTORS

The UNITED STATES OF AMERICA, by and through its attorney, ZACHARY T. FARDON, United States Attorney for the Northern District of Illinois, respectfully submits its position paper as to sentencing factors, and asks this Court to sentence the defendant Darnell McMiller above the applicable Guidelines range to a sentence of 8 to 10 years' imprisonment.

### I. BACKGROUND.

This case arises out of a long-term investigation of the Black Disciples street gang in which the government used a cooperating witness ("CW-1") to make controlled narcotics purchases, including purchases of cocaine base in the form of crack cocaine on three occasions from the defendant. *See* Presentence Report, dated March 17, 2014 ("PSR") at ¶¶ 9-10.

Specifically, on January 6, 2011, the defendant distributed to CW-1 approximately 3.1 grams of crack cocaine. As corroborated by recorded telephone calls and an audio/visual recording of an in-person meeting, CW-1 told the defendant that he wanted to purchase a "simple small piece," meaning a small sample of crack cocaine, "to see if it's good product." The defendant asked CW-1 if he wanted a "half," meaning a half ounce of crack cocaine, and CW-1 clarified that he wanted to start with an "eight ball," meaning an eighth of an ounce of crack

cocaine. The defendant obtained the crack cocaine from his supplier and distributed it to CW-1 in exchange for $100. R.1 (Complaint) at ¶¶ 9-21.

On January 11, 2011, the defendant distributed to CW-1 an additional approximately 62.4 grams of crack cocaine. During recorded telephone conversations on that day, the defendant asked CW-1 if he wanted to purchase "both" for "2200," meaning two ounces of crack cocaine for $2,200. After discussion of price, quality, and alternative sources from which to obtain two ounces of crack cocaine, the defendant and CW-1 drove to the defendant's supplier, where the defendant obtained and distributed to CW-1 approximately 62.4 grams of crack cocaine for $2,200. R.1 at ¶¶ 22-38.

On February 4, 2011, the defendant distributed to CW-1 an additional approximately 64.2 grams of crack cocaine and 1.6 grams of marijuana. During recorded telephone conversations on February 1 and 4, 2011, CW-1 and the defendant agreed that the defendant would supply CW-1 with an additional 63 grams of crack cocaine for $2,200. Then, on February 4, 2011, the defendant obtained and distributed to CW-1 the agreed-upon quantity of crack cocaine and a "flower" of marijuana. The defendant told CW-1 that his supplier "gave it to us hard again … and threw some weed in on top of it," but that on the "next move," he was going to "get[ ] it for 17," meaning 63 grams of crack cocaine for $1,700. R.1 at ¶¶ 39-51.

Each of these transactions was recorded and is more fully detailed in the government's version of the offense, dated February 21, 2014.

## II. GOVERNMENT'S OBJECTIONS TO THE PRESENTENCE REPORT.

Paragraph 6 (Page 4): The PSR states that, on February 6, 2014, defendant pled guilty pursuant to a "written non-binding plea agreement." This is incorrect. The plea agreement is

2

binding on both parties, although the parties acknowledged that the Guidelines calculations contained therein were preliminary in nature and subject to further review of the facts and law.

## III. APPLICATION OF THE SECTION 3553(a) FACTORS DEMANDS AN ABOVE-GUIDELINES SENTENCE.

The facts of this case, together with the factors set forth in 18 U.S.C. § 3553(a)—in particular, the defendant's violent background and past actions indicating a profound lack of respect for the law, coupled with the need to reflect the seriousness with which our society views the defendant's offenses and the addictive nature of crack cocaine—demands a meaningful sentence of incarceration above the advisory Guidelines range. For the reasons set forth below, the government requests that the Court sentence defendant to a term of 8 to 10 years' imprisonment.

### A. The Correct Guidelines Calculation Should Be 63-78 Months' Imprisonment.

The government concurs with the Probation Officer's calculation of the defendant's offense level and criminal history category. Specifically, as outlined in the PSR and written plea agreement (R.31), between January and February 2011, the defendant distributed to CW-1 at least approximately 129.7 grams of crack cocaine and 1.6 grams of marijuana, resulting in an offense level of 28 under Guideline § 2D1.1(a)(5) and (c)(6). PSR at ¶ 18. Accounting for three points for the defendant's timely acceptance of responsibility, the adjusted offense level is 25. PSR at ¶¶ 25-27. As outlined in the PSR, the defendant's criminal history category is II, resulting in an advisory Guidelines range of 63 to 78 months' imprisonment. PSR at ¶ 75.

### B. Defendant's History and Characteristics Weigh Strongly in Favor of a Sentence of 8 to 10 Years' Imprisonment.

The defendant's history and past acts show a man marked by violent conduct and a disregard for human life. His violent history is well-documented, is not appropriately reflected in his criminal history category, and warrants an above-Guidelines sentence.

First, during a recorded transaction with CW-1 on January 11, 2011, discussing his relationship with his crack cocaine supplier, the defendant told CW-1, "I do hits for him," and then, "I go in for him," meaning that the defendant kills people for money on behalf of his supplier. CW-1 clarified, "So you a hit man for him?" The defendant responded, "Yeah," to which CW-1 replied, "That's why they call you 'Murder.'" R.1 at ¶ 35.

Second, in addition to conducting recorded narcotics transactions with the defendant and others, CW-1 consented to the installation of audio and visual recording equipment in his place of business. As of early 2011, leaders of the Black Disciples gang, which is a violent street gang based on Chicago's southside, gathered in CW-1's place of business to conduct gang business. Defendant was a high-ranking member of the gang and was present for many of these meetings. Indeed, during the recorded conversations leading up to the January 11, 2011 charged crack cocaine transaction, CW-1 and the defendant discussed the defendant's rank within the Black Disciples, including the defendant's possible ascendancy to the position of "king" after the death of the gang's former leader.[1] R.1 at ¶ 27.

Two recordings made in CW-1's place of business were admitted as exhibits during the

---

[1] The defendant's rank within the gang is further confirmed by the fact that he travels with security. During recorded calls leading up to the January 6, 2011 transaction, the defendant told CW-1 before arriving at CW-1's place of business, "I already told the man, secure this whole block." R.1 at ¶15.

defendant's November 26, 2013 detention hearing, and segments were played for the Court. R.26 (detention order). These tapes will again be made available for the Court's review at the sentencing hearing.

During the first recording, dated January 4, 2011, the defendant met with his fellow gang members in CW-1's place of business. As depicted by the video recording, another gang member had just shot someone and was carrying the firearm he had used. The defendant took the firearm from this individual, unloaded the spent casing, handed the spent casing to another gang member, and instructed him to get rid of it. This itself is a felony offense: As of January 4, 2011, the defendant had been convicted of a felony and, as a felon, he is not permitted to possess a firearm. *See* 18 U.S.C. § 922(g); R.26 at 2. Then, for the duration of the recording, the defendant talked at length about other guns he owns and bragged to other gang members about using these guns to shoot people, including rival gang members. For example, the defendant talked about firing his "MAC" (a submachine gun), a "30-odd-6" (a firearm that uses a .30-06 cartridge), and a "chopper" that "jammed" (a AK-47 assault rifle). He joked about his victims who screamed for their lives, including individuals who yelled, "we've got our bitches with us," and tried to run. As the Court remarked in its detention order, dated December 2, 2013, "[w]hether Defendant in fact did carry out the shootings or not, the video is disturbing because it shows him taking pleasure in tales of violence, and ridiculing victims who reportedly pleaded for mercy." R.26 at 2.

During the second recording, dated January 5, 2011, the defendant is depicted conducting a severe beating of a fellow gang member, while other gang members watched. The Court, in its detention order, described the beating as "vicious," marked by the defendant "striking the

5

individual repeatedly until his victim stop[ped] screaming, and again appearing to take pleasure in violence." R.26 at 2.

The defendant's convictions and arrests further demonstrate his violent history. In 2008, the defendant was convicted of aggravated battery of a peace officer, after he struck two officers about their face and body with a closed fist when they attempted to arrest another individual. PSR at ¶ 33. His arrests tell a similar story: He was arrested in 2001 for battery and in 2006 for aggravated battery with a firearm. PSR at ¶¶ 37, 39. He was arrested in 2010 for assault stemming from an incident in which he threatened another individual. PSR at ¶ 44. Less than a month later, also in 2010, he was arrested for aggravated assault stemming from an incident in which he pointed a firearm at two other individuals. PSR at ¶ 45.

In short, the defendant's recorded admission that he kills people for money, his recorded admission that he has possessed and used numerous weapons including submachine guns, his recorded severe and violent beating of a fellow gang member, and his conviction and arrests for violent crimes all confirm a violent history that is understated by his criminal history category. This history creates a significant need to both deter the defendant from engaging in future criminal activity and to protect the public. *See* 18 U.S.C. § 3553(a)(2)(B)-(C); *see also United States v. Padillo*, 618 F.3d 643, 645-46 (7th Cir. 2010) (affirming above-Guidelines sentence where necessary to accomplish these goals). Accordingly, the government recommends that the Court sentence the defendant above the advisory Guidelines range to a term of 8 to 10 years' imprisonment, which roughly would correspond to a criminal history category of V. *Cf.* U.S.S.G. § 4A1.3(a)(1) (recommending an upward departure where "reliable information indicates that the defendant's criminal history category substantially underrepresents the

seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes").

### C. The Nature of Defendant's Crimes Also Support an Above-Guidelines Sentence.

Over the course of about four weeks, the defendant accumulated and distributed almost 130 grams of crack cocaine, worth $4,500.  It is a fair assumption that January 6, 2011 was not the first time the defendant sold crack cocaine and that February 4, 2011 was not the defendant's final narcotics transaction before his 2013 arrest.  These transactions are simply a sampling of the defendant's narcotics dealing: They demonstrate that the defendant had ready access to crack cocaine for sale and routinely engaged in drug transactions of this sort.  In addition, during one of the recorded transactions, on January 11, 2011, CW-1 asked the defendant whether he "know[s] how to cook that shit up," meaning whether he knows how to convert powder cocaine into crack cocaine."  The defendant responded, "I'm a beast . . . I know how to dry cook."  R.1 at ¶ 33.  In other words, the defendant not only supplied crack cocaine to wholesale and retail customers like CW-1, but he also converted powder to crack cocaine for resale.  Both types of conduct are nothing short of the equivalent of introducing poison into Chicago communities.

The seriousness of the defendant's conduct can hardly be overstated.  Crack cocaine destroys lives.  It causes cycles of illness and addiction, hopelessness and destruction of families.  As the Seventh Circuit has remarked, "[c]rack is not defined merely by its secondary ingredients; it is a 'product,' particularly dangerous because of its ability to reach a wide, susceptible market and produce, in that market, disastrous effects for both those who fall prey to its addictive allure and the people who come in contact with them." *United States v. Bryant*, 557 F.3d 489, 500 (7th Cir. 2009).  A reasonable and appropriate sentence in this case will

reflect the seriousness of this conduct and the need to deter others—particularly in the Chicagoland area where drugs, violence, and related crimes are rampant—from engaging in similar conduct.

Post-imprisonment in this case, the defendant will have to make the same choice that he has made numerous times before when released after his past offenses and arrests: return to the cycle of crime, or comply with the criminal laws, as he is required to do. A significant term of imprisonment that will afford deterrence and encourage rehabilitation is necessary to push the defendant to choose the latter option.

**IV. CONCLUSION.**

For the reasons stated above, the government respectfully requests that this Court sentence the defendant above the applicable Guidelines range to a sentence of 8 to 10 years' imprisonment.

    Respectfully submitted,

    ZACHARY T. FARDON
    United States Attorney

By:    s/ Andrianna D. Kastanek
    ANDRIANNA D. KASTANEK
    Assistant U.S. Attorney
    219 South Dearborn Street, Room 500
    Chicago, Illinois 60604
    (312) 353-5300